*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LISA KEMERER, and all others similarly situated,

    Plaintiff-Appellee/Cross-Appellant,

v

STATE OF MICHIGAN and DEPARTMENT OF TREASURY,

    Defendants-Appellants/Cross-Appellees.

FOR PUBLICATION
October 29, 2024
12:23 PM

No. 362055
Court of Claims
LC No. 21-000224-MZ

Before: LETICA, P.J., and N. P. HOOD and MALDONADO, JJ.

PER CURIAM.

In this action alleging a taking under the Uniform Unclaimed Property Act (UUPA), MCL 567.221 *et seq*., defendants appeal by leave granted[1] the Court of Claims' (COC) order partially denying defendants' motion for summary disposition brought under MCR 2.116(C)(8) (failure to state a claim) and (10) (no genuine issue of material fact). Plaintiff cross-appeals the court's order partially granting summary disposition pursuant to MCR 2.116(C)(8). We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL HISTORY

In March 2022, plaintiff filed a complaint[2] alleging that defendants held three of her assets: $1,831.05 from a former checking account, $446.00 from a former insurance premium, and

---

[1] *Kemerer v Michigan*, unpublished order of the Court of Appeals, entered March 13, 2023 (Docket No. 362055).

[2] Plaintiff filed this second amended complaint was by consent of the parties. We do not delineate the prior complaints, underlying discovery matters, or the initial dispositive motion because those issues are not pertinent to this appeal. Additionally, plaintiff individually filed her complaint but proposed it as a class action for which she would represent the class. The issue of the certification of the class remained pending in the COC.

$208.00 from the Department of Corrections. Plaintiff acknowledged receipt of a refund from defendants of $2,485.05, the full amount of the three assets without any deductions or interest. Yet, plaintiff claimed that after the holders of her assets turned them over, defendants took custody of the funds and generated interest. Plaintiff alleged that defendants' conduct amounted to a taking of her principal for a public use without notice or an opportunity to be heard. Specifically, she contended that defendants used "more recently turned over unclaimed property monies" to pay out "the prior seizure and use of [p]laintiff's money" and essentially engaged in a "Ponzi scheme."

Plaintiff further alleged that when "non-real" property belonging to a person was inactive for a period of time, it constituted "unclaimed property" in Michigan. This type of property could include checking and savings accounts, unpaid wages, securities, life-insurance payouts, uncashed checks, unredeemed rebates, and the contents of safe-deposit boxes. The holder of the unclaimed property was required to turn it over to the State, where it was maintained in either the general fund or the trust fund from which claims were paid. Plaintiff asserted that, irrespective of how the monies were classified for accounting purposes, they generated additional earnings in the form of interest.

In Count I of her complaint, plaintiff contended that earned income on the property assets, "less proportional custodial expenses," constituted inverse condemnation in violation of the Fifth Amendment to the United States Constitution, for taking her property without the payment of just compensation. And, despite receipt of her refund, in Count II, plaintiff alleged inverse condemnation pertaining to her principal property. Specifically, plaintiff alleged that monies from newly arriving unclaimed property funds were used to pay out "older turn-overs" when a payment demand was made. It was claimed that a prior taking of plaintiff's funds occurred that could not be cured through the "conversion" of other unclaimed properties for which defendants were charged with maintaining "custody" and "safekeeping." Plaintiff requested that the court order a constructive trust be imposed in light of defendants' failure to recognize the common-law doctrine of interest follows the principal in Count III. In Counts IV and V, plaintiff alleged an unconstitutional taking by defendants pertaining to the principal and interest. And in Counts VI and VII, plaintiff alleged that defendants violated due process for failing to provide pre-deprivation notice and an opportunity to be heard addressing the unclaimed property and any interest.

Defendants moved for summary disposition under MCR 2.116(C)(8) and (10). Defendants alleged that the state historically had sovereign and common-law rights to take custody of or assume title to abandoned property. And, if no one claimed the property, it would return to the state for the general good. The UUPA was purportedly a codification of the law of escheat and *bona vacantia*.[3] Defendants asserted that plaintiff could not maintain an action for taking, inverse condemnation, or constructive trust because she did not have a property right to interest that accrued while the property was in defendants' possession. They claimed that defendants' rightful acceptance of properties from holders entitled defendants to use the abandoned property as the presumptive owner. And when abandoned property was not interest-bearing at the time it came into defendants' possession, plaintiff failed to demonstrate a property right to any alleged accrued

---

[3] "*Bona vacantia*" means "[o]wnerless property; goods without an owner." Black's Law Dictionary (12th ed), p 217.

interest. Further, the property paid to plaintiff was paid from a noninterest-bearing account. That is, when plaintiff made a claim and rebutted the presumption of abandonment, she did not have a vested interest in the property during the period of presumed abandonment. After rebutting the presumption of abandonment, plaintiff only established a property right to a sum certain. She did not acquire interest in defendants' accounts. Defendants claimed that a taking and inverse condemnation could not be established because a State was not required to compensate a property owner for her own neglect. Defendants took no action to separate plaintiff from her property; rather, defendants' interest was acquired through plaintiff's abandonment.

Defendants further contended that plaintiff's argument relying on the common-law principle that "interest follows principal" was misguided. According to defendants, courts defer to a common-law doctrine when a statutory scheme is silent. But, the UUPA explicitly addresses what a property claimant may receive, the amount of interest, and the interest rate. The doctrine of interest follows principal does not include abandoned property. Defendants alleged that the majority view was that claimants did not have constitutional rights to interest accruing on property while in the state's possession that had been neglected and abandoned. And, just compensation for a taking was measured by the owner's loss and not the government's gain. When a property owner did not have a right to receive interest from the holder, the property owner suffered no loss when the exact value of the property was later returned by the State. When her property was abandoned, plaintiff had no vested interest during the abandonment period, and defendants presumptively held title during that time. Defendants asserted that their free, online searchable database and actions as a central repository for abandoned property did not constitute a "Ponzi scheme." Defendants further alleged that plaintiff was not deprived of due process because her principal property interest was returned to her. And, the UUPA's notice procedures were not deficient in light of the notice of publication and searchable website. Accordingly, defendants sought summary disposition in their favor.

Plaintiff responded to defendants' dispositive motion. She asserted that defendants' Unclaimed Property Program (UPP) generated millions of dollars in revenue, and the UPP's lack of clarity was a sufficient ground to deny summary disposition. She further alleged that defendants were merely custodians of her property, and she was entitled to interest because of the common-law doctrine that interest follows principal. Moreover, the destruction of a common-law property right by statute constituted a taking for which compensation was due. According to plaintiff, defendants "gobbled" the interest earned on custodial funds, and this "seizure and use" of the generated interest was actionable and unconstitutional. Further, plaintiff alleged that defendants did not acquire title to the property, but merely acted as a custodian. She urged the court to follow federal precedent that entitled a property owner to acquire interest earned while in state custody less administrative fees and reject any contingency that the property must be interest-bearing at the time of state receipt to warrant payment of interest to a claimant.

Plaintiff also asserted that summary disposition was premature because discovery had not occurred. Therefore, she was unable to discern the property held in the UPP program, the interest earned, the UPP money spent by defendants, and whether a "Ponzi scheme" was occurring. Plaintiff alleged that she pleaded to two types of takings, addressing interest generated and transferred to the general fund and principal used to address budget shortfalls. Additionally, if the defendants misused private citizens' property to cure budgetary shortfalls, they were required to provide due process before depriving citizens of their property rights.

The COC concluded that defendants were entitled to summary disposition of plaintiff's claims pertaining to the principal but denied summary disposition relating to the interest claims. The COC rejected plaintiff's claims that defendants did not return her exact principal property to her because money is fungible, stating:

> [Defendants] held those funds for [plaintiff] until she sought to reclaim them. [Defendants'] custodial act of retaining property for another "does not constitute a deprivation of property for the purpose of establishing a due process claim." *Marlin v Detroit (After Remand)*, 205 Mich App 335, 340; 517 NW2d 305 (1994). And because the property [plaintiff] reclaimed was fungible, her contention that the [defendants'] actions amounted to a taking by allegedly giving her someone else's fungible property equal in value to her own fungible property is meritless. Indeed, [plaintiff] has not even alleged that her unclaimed property was made up of specific, tangible, bills and coins. Rather, her unclaimed property was fungible cash that was most likely electronically stored—and that is exactly what [defendants] gave back to her. Thus, [defendants are] entitled to summary disposition under MCR 2.116(C)(8) on [plaintiff's] claims related to her principal (Counts II, V, and VII).

When addressing interest as applied to the UUPA, the COC determined that unclaimed property was presumptively, but not conclusively, abandoned by merely being held in defendants' custody because a claimant may reassert ownership and possession. Therefore, according to the COC, plaintiff retained a property interest in the principal even though it was in defendants' custody. The COC further acknowledged that the Legislature had the authority to modify the common law but must do so in no uncertain terms and not by implication. Because the Legislature did not do so in the UUPA, the COC concluded that defendants remained bound by the common law. Therefore, defendants were required to return reclaimed property to a claimant with any interest earned on that property. In so holding, the COC recognized that this was the minority view across jurisdictions. And because the Legislature did not abrogate the common law in no uncertain terms, the COC concluded that the rule that interest follows principal survived. Because of the factual uncertainty of whether plaintiff's property generated interest through the trust or general fund, however, the COC concluded that additional discovery was warranted. Accordingly, it denied defendants' motion for summary disposition of the interest claims raised in Counts I, III, IV, and VI.

As noted, we granted defendants' application for leave to appeal. On appeal, defendants contend that they maintain sovereign and common-law rights to take custody of or "assume title" to abandoned property and to exercise rights over the property, including disposal and beneficial use for the general public, without being required to pay interest. It is further asserted that the UUPA did not entitle individuals to obtain property rights in the State's general fund. Finally, defendants allege that the UUPA abrogated the doctrine of interest follows principal, and the doctrine did not apply to abandoned property. Therefore, the COC erred by adopting the minority view regarding plaintiff's entitlement to interest.

Plaintiff answered the defendants' appeal but also filed a cross-appeal. She alleges that the COC correctly denied summary disposition of her interest claims on takings and due-process grounds; however, it erred by dismissing her claims applicable to the principal, contending that a

taking occurred and that summary disposition on any issue was premature before she had an opportunity to engage in discovery. Finally, plaintiff alleges that defendants conceded to being only the custodian of property and not the owner, thereby entitling her to private-property rights.

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 448; 980 NW2d 119 (2021). A motion brought under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. Under MCR 2.116(C)(8), summary disposition is appropriate when the opposing party failed to state a claim on which relief can be granted. *In re Lett Estate*, 314 Mich App 587, 595; 887 NW2d 807 (2016). Under this subpart, the legal sufficiency of a claim is examined by the pleadings alone with the factual allegations accepted as true and viewed in a light most favorable to the nonmoving party. *Id*. "The motion may be granted only when a claim is so clearly unenforceable that no factual development could justify recovery." *Id*. (citation omitted).

A motion for summary disposition premised on MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Charter Twp of Pittsfield*, 338 Mich App at 449. The moving party must identify and support the issues they believe create no genuine issue of material fact. *Id*. Any affidavits, pleadings, depositions, admissions, and other documentary evidence submitted with the motion must be examined. *Id*. Once the moving party makes and supports its motion, the opposing party may not rest on mere allegations or denials in their pleadings, but must submit documentary evidence setting forth specific facts to demonstrate a genuine issue exists for trial. *Id*. (quotation marks and citation omitted).

An issue of statutory interpretation presents a question of law that the appellate court reviews de novo. *Buhl v Oak Park*, 507 Mich 236, 242; 968 NW2d 348 (2021). When interpreting a statute, the ultimate goal is to give effect to the Legislature's intent. *Milne v Robinson*, 513 Mich 1, 12; 6 NW3d 40 (2024). The most reliable evidence of legislative intent is the plain language of the statute. *Klooster v Charlevoix*, 488 Mich 289, 296; 795 NW2d 578 (2011). If the language of the statute is clear and unambiguous, it is presumed that the Legislature intended the meaning plainly expressed in the statute. *Gardner v Dep't of Treasury*, 498 Mich 1, 6; 869 NW2d 199 (2015). "In construing a legislative enactment we are not at liberty to choose a construction that implements any rational purpose but, rather, must choose the construction which implements the legislative purpose perceived from the language and the context in which it is used." *Le Gassick v Univ of Mich Regents*, 330 Mich App 487, 495-496; 948 NW2d 452 (2019) (citation omitted). Once the intention of the Legislature is discovered, this intent prevails regardless of any conflicting rule of statutory construction. *GMAC LLC v Dep't of Treasury*, 286 Mich App 365, 372-373; 781 NW2d 310 (2009) (citation omitted).

## III. HISTORICAL OVERVIEW OF ABANDONED PROPERTY

This case hinges on the interpretation and application of the UUPA. The UUPA codifies the law of escheats, which has a long history in Michigan:

> The governor and judges of Michigan Territory adopted an escheat law in 1818, and throughout the early statutes passed in 1842 and 1846, until Act No. 238,

Pub. Acts 1897 . . . became effective, the law of escheats in Michigan was predicated on the idea that the State should claim lands or other property by reason of the owners thereof dying intestate leaving no legal heirs. Likewise, beginning with the earliest statutes of descent and distribution of the property of a deceased person . . . and down through a succession of amendments to the present statutes of descent and distribution, still part of our statute law[,] . . . if one dies intestate without heirs or kindred, his estate escheats to the people of the State. [*Evans Products Co v Fry*, 307 Mich 506, 519-520; 12 NW2d 448 (1943) (citations omitted).]

Statutory law extended the doctrine of escheats to personal property, such as property found on the body of an unknown deceased person, property belonging to a convict who died before release, or any other personal property that appeared to lack a real owner. *Id*. In 1897, the Legislature expanded the doctrine to the deposits of monies and securities related to corporations, banks, and trusts. *Id*. at 520-521.

In 1947, the Legislature provided that the state board of escheats would have authority over matters pertaining to missing owners and abandoned property:

[T]he attorney general of this state shall, as hereinafter provided, except as to those powers and duties vested by the constitution or general laws of this state or the provisions of this act in the state board of escheats, take charge of all matters pertaining to lands or other property which is subject to escheat or escheatable, by reason of the owner thereof having died intestate, leaving no known heirs-at-law; or, by reason of the owner thereof having disappeared or being missed from his last known place of residence for a continuous period of 7 years or more, leaving no known heirs-at-law; or, by reason of the owner thereof having abandoned such property. [1947 PA 329, § 1.]

The 1947 code of escheats provided distinct definitions for "abandoned property" and "escheatable property." Compare 1947 PA 329, § 5(e)[4] with 1947 PA 329, § 5(h).[5] Both categories of property "descend[ed] to the state of Michigan as an escheat . . . ." 1947 PA 329, § 4. However, a person could recover property that had been deemed abandoned by filing a claim for it and having that

---

[4] "The term 'abandoned property' means property . . . against which a full period of dormancy . . . has run." 1947 PA 329, § 5(e). "The term 'period of dormancy' means the full and continuous period of 7 years, during which an owner has ceased, failed or neglected to exercise dominion or control over his property or to assert a right of ownership or possession; or to make presentment and demand for payment and satisfaction; or to do any other act in relation to or concerning such property." 1947 PA 329, § 5(f).

[5] "The term 'escheatable property' means property which is subject to escheat to the state of Michigan under and by virtue of the provisions of the constitution of the state, the general laws of this state, or the provisions of this act." 1947 PA 329, § 5(h).

claim adjudicated. See 1947 PA 329, § 33. When interpreting 1947 PA 329, the Michigan Supreme Court explained:

> [T]he Michigan code of escheats is custodial in nature, provision being specifically made for the rightful owner of securities that have been taken into possession by virtue of proceedings under the act to have restored to him the property taken or its equivalent. There is, in other words, no deprivation of property rights of an owner, or of one possessing the rights thereof, of securities or dividends. [*Schoener v Continental Motors Corp*, 362 Mich 303, 310; 106 NW2d 774 (1961).]

This all predates Michigan's 1963 Constitution, which provides that "[p]rocedures relating to escheats and to the custody and disposition of escheated property shall be prescribed by law." Const 1963, art 10, § 4. By requiring that these procedures be prescribed by law, the Constitution indicated that legislative implementation is necessary to carry out this constitutional provision. *House Speaker v Governor*, 443 Mich 560, 591 n 36; 506 NW2d 190 (1993). In sum, the laws of escheat and *bona vacantia* have not been a matter of common law for quite some time. And, the UUPA, which was enacted by 1995 PA 29 and became effective in 1996, repealed the code of escheats by repealing 1947 PA 329. MCL 567.264.

## IV. DEFENDANTS' APPEAL

Defendants contend the trial court erred by determining that the UUPA did not abrogate the common law and that the doctrine of interest follows the principal applied. We agree.

Whether a statutory scheme preempts the common law presents an issue of legislative intent. *Hoerstman General Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006) (citation omitted). The common law remains in full force and effect until modified. *Yang v Everest Nat'l Ins Co*, 507 Mich 314, 325; 968 NW2d 390 (2021) (citation omitted). An abrogation of the common law by the Legislature will not be lightly presumed. Instead, the courts must require that the Legislature speak in "no uncertain terms" when exercising its authority to modify the common law. *Id*. (citation omitted). There is a presumption of the Legislature's knowledge of the common law when it enacts a statute. *Id*.

> In general, where comprehensive legislation prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions, the Legislature will be found to have intended that the statute supersede and replace the common law dealing with the subject matter. [*Hoerstman General Contracting, Inc*, 474 Mich at 74 (citation omitted).]

The statutory extinguishment of a common-law right is a proper exercise of legislative authority. *Marquis v Hartford Accident & Indemnity*, 444 Mich 638, 653; 513 NW2d 799 (1994) (citation omitted). Nonetheless, statutes in derogation of the common law are to be strictly construed. *Id*. Although the statute should not abrogate established common law by implication, the statute must be "construed sensibly and in harmony with the legislative purpose." *Id*. (citation omitted). The legal maxim *expressio unius est exclusio alterius* is a rule of construction premised on logic and common sense and is used to properly construe statutes. *Hoerstman General Contracting, Inc*, 474 Mich at 74 (citation omitted). This legal maxim means "[t]he expression of one thing is the

exclusion of another." *Id*. at 74 n 8, citing Black's Law Dictionary (7th ed), p 1635. Accordingly, when a statute contains exceptions or conditions, the delineation eliminates the possibility of other exceptions. *Id*. at 74.

Under the UUPA, "all property, including any income or increment derived from the property, less any lawful charges," held in a holder's business and left unclaimed for more than three years after it becomes payable is "presumed abandoned." MCL 567.223(1). Despite an owner's[6] failure to make a demand, the property is payable or distributable. See MCR 567.223(2). The property[7] is "subject to the custody" of the State "as unclaimed property, if the conditions raising a presumption of abandonment" are satisfied. See MCL 567.224. After identifying various properties and the time frame for a presumption of abandonment, MCL 567.225 through MCL567.237, MCL 567.238(1) and (2) delineate the obligation on the holder of presumed abandoned property to provide a report including any identifying information of the owner.

The administrator of the UPP must publish notice to owners of abandoned properties in a statewide newspaper as well as maintain a website. See MCL 567.239(1) and (3). The website advises of the names of owners of abandoned properties, a claim form, and how to file a claim. See MCL 567.239(3). After the holder of property delivers it to the UPP administrator, "the state assumes custody and responsibility for the safekeeping of the property." MCL 567.241(1). MCL 567.242 addresses property other than money and states:

> If property other than money is paid or delivered to the administrator under this act, the owner is entitled to receive from the administrator any dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion of the property into money.

Additionally, MCL 567.243 addresses the UPP administrator's sale of property and provides:

> (1) Except as provided in subsections (2) and (3), the administrator, not later than 3 years after the receipt of abandoned property, shall sell it to the highest bidder at public sale in whatever city in the state affords, in the judgment of the administrator, the most favorable market for the property involved. The administrator may decline the highest bid and reoffer the property for sale if, in the judgment of the administrator, the bid is insufficient. If, in the judgment of the administrator, the probable cost of sale exceeds the value of the property, the property need not be offered for sale. Any sale held under this section shall be

---

[6] An "owner" is defined as "a depositor, in the case of a deposit; a beneficiary, in case of a trust other than a deposit in trust; a creditor, claimant, or payee, in the case of other intangible property; or a person having a legal or equitable interest in property subject to this act. Owner includes the legal representative of the person defined as an owner in this subdivision." MCL 567.222(n).

[7] Generally, the property is not subject to defendants' custody if its value is "$25.00 or less." MCL 567.224a(1).

preceded by a single publication of notice, at least 3 weeks in advance of sale, in a newspaper of general circulation in the county in which the property is to be sold.

(2) Securities listed on an established stock exchange shall be sold at prices prevailing at the time of sale on the exchange. Securities not listed on an established stock exchange may be sold over the counter at prices prevailing at the time of sale or by any other method the administrator considers advisable.

(3) Unless the administrator considers it to be in the best interest of the state to do otherwise, all securities presumed abandoned under this act and delivered to the administrator shall be sold within 1 year of the receipt of the securities. A person making a claim under this act against the state, the holder, any transfer agent, registrar, or other person acting for or on behalf of a holder is not entitled to any appreciation in the value of the property occurring after delivery by the holder to the administrator.

(4) The purchaser of property at any sale conducted by the administrator under this act takes the property free of all claims of the owner or previous holder of the property and of all persons claiming through or under the owner or previous holder. The administrator shall execute all documents necessary to complete the transfer of ownership.

Although the UPP administrator is to deposit any funds into the general fund, including those arising from the sale of abandoned property, a separate trust fund of $100,000 was created to immediately pay claims. See MCL 567.244(1). MCL 567.245 delineates how a claim is made. Pertinent to this appeal, MCL 567.245(3) addresses the proceeds that a claimant will receive, stating:

If a claim is allowed, the administrator shall pay over or deliver to the claimant the property or the amount the administrator actually received or the net proceeds if it has been sold by the administrator, plus any additional amount required by [MCL 567.242[8]]. If the property claimed was interest bearing to the owner on the date of surrender by the holder, and if the date of surrender is on or after March 28, 1996, the administrator also shall pay interest at a rate of 6% a year or any lesser rate the property earned while in the possession of the holder. Interest begins to accrue when the interest bearing property is delivered to the administrator and ceases on the earlier of the expiration of 10 years after delivery or the date on which

---

[8] Again, MCL 567.242 provides:

If property other than money is paid or delivered to the administrator under this act, the owner is entitled to receive from the administrator any dividends, interest, or other increments realized or accruing on the property at or before liquidation or conversion of the property into money.

payment is made to the owner.  No interest on interest bearing property is payable for any period before March 28, 1996.  [MCL 567.245(3) (footnote omitted).]

In sum, the UUPA is comprehensive legislation that describes, in precise detail, the course of conduct that a claimant must engage in to recover presumptively abandoned property.  The UPP administrator must give notice of newly-acquired property in state newspapers, maintain identifying information of the owner of the property, maintain a website of property in custody, exercise authority over the property to acquire its best value even if it entails a sale, and place the property in the general or separate trust fund.  It further provides the acts a claimant must engage in to acquire a presumptively abandoned interest.  Finally, the UUPA identifies limits on the entitlement to interest, prescribing that it applies to property that was interest-bearing to the owner on the date surrendered by the holder.  In light of the legislative intent as expressed in the Legislature's plain language, we conclude that the UUPA was intended to supersede and replace any common law pertaining to escheated or abandoned property in Michigan.  *Hoerstman General Contracting, Inc*, 474 Mich at 74 (citation omitted).  The legislative limitation on interest-bearing property was set forth in certain terms and there was no need for the Legislature to declare that noninterest-bearing property would be returned without interest.  The COC erred by concluding that the Legislature failed to address the collection of interest in certain terms, and therefore, did not abrogate the common law.  Accordingly, we reverse the COC's decision denying defendants' motion for summary disposition of the interest claims and allowing plaintiff to engage in discovery pertaining to her noninterest-bearing claims.

Moreover, we agree with defendants that application of the doctrine of interest follows principal to the present facts is unwarranted.  In *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 US 155, 156; 101 S Ct 446; 66 L Ed 2d 358 (1980), the appellant, Eckerd's of College Park, Inc. (Eckerds), entered into an agreement to purchase substantially all of the assets of Webb's Fabulous Pharmacies, Inc. (Webbs), both Florida corporations, for $1,812,145.77.  But, at the closing, it was learned that Webbs' debt might exceed the purchase price.  Eckerds filed an interpleader complaint in Florida, including all of Webbs' creditors, and tendered the purchase price to the court.  Under Florida law, the court clerk deposited the purchase price into an assignable interest-bearing account. The clerk deducted a statutory fee from the interpleader fund of $9,228.74.  A receiver was appointed to determine the number and amount of claims filed against the interpleader fund, and the court ordered that the receiver be paid $40,200.  But, there was also $100,000 in interest earned from the fund, and a dispute arose regarding the party entitled to that interest.  *Id*. at 156-159.

The United States Supreme Court noted that Webbs' creditors had more than a unilateral expectation that the deposited funds were held for their ultimate benefit, and not for the benefit of the county.  In fact, the creditors had a state-created property right to their portion of the fund, less proper and authorized court charges.  *Id*. at 161.  Further, the Court cited the general rule that "any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal."  *Id*. at 162.  The Court rejected the contention that the court clerk used the interest to promote the "public good" because the "forced contribution" was used to generate government revenue without any relationship to court costs.  *Id*. at 163.  Moreover, the principal could not be recharacterized as "public money" simply because it was temporarily held by the court fund.  *Id*. at 164.  But, the Court ultimately noted that its ruling was premised on the narrow circumstances of the case—where there was a separate state statute

-10-

authorizing a clerk's fee for services rendered premised on the amount of the principal deposited; where there was a concession that the deposited funds were private; and where the deposit was required to offer creditor protection. The Court expressed no view of the constitutionality of a statute that allowed for county retention of earned interest where the interest was the only return to the county for services rendered. *Id*. at 164-165.

In *Phillips v Washington Legal Foundation*, 524 US 156, 159; 118 S Ct 1925; 141 L Ed 2d 174 (1998), Texas adopted an Interest on Lawyers Trust Account (IOLTA) requiring certain attorney-held client funds be deposited in bank accounts and that the interest income generated by those funds be paid to foundations that finance legal services for low-income individuals. *Id*. at 159-160. The question presented was whether the interest earned on client funds held in IOLTA accounts constituted private property of the client or the attorney for purposes of a taking. *Id*. at 160. The Court applied the "interest follows principal" rule to conclude that the IOLTA account was the private property of the client where the principal was held in the account and there was no authority identified to deprive the client-owner of the interest generated. *Id*. at 165-168. Despite the application of "interest follows principal," the Court noted that the holding did not prevent a state from imposing reasonable fees that were incurred in generating and allocating interest income. *Id*. at 171. Furthermore, the Court "express[ed] no view as to whether these funds have been 'taken' by the [s]tate", and did not address an amount that the state could claim as just compensation. *Id*. at 172.

Thereafter, in *Brown v Legal Foundation of Washington*, 538 US 216, 217; 123 S Ct 1406; 155 L Ed 2d 376 (2003), the Court addressed the question of whether the state could take the interest generated from an IOLTA account. Ultimately, the Court concluded that even if property was taken, a Fifth Amendment violation only occurred if the taking arose without just compensation. And, any taking of property would be "nil" when the costs of the IOLTA program effectively equaled the administrative fees such that no constitutional violation occurred. *Id*. at 240.

In these United States Supreme Court cases, a private asset was involved, there was a mandate that the asset be deposited into an interest-generating account, and the general rule of "interest follows principal" was applied. The owners of the property were known, the interest-generating accounts were required, and the government entity administrating the asset was entitled to deduct fees for maintenance. In the present case, however, the property at issue was presumed abandoned. Under the UUPA, holders of property unable to return it to its owner transferred the property to defendants. Defendants then published notice of receipt of the asset and maintained a searchable website, actions designed to return the property to its owner. The Legislature directed that the property be deposited into the general fund because it was unclear when or if the owner would reclaim the property.[9] Although MCL 567.224 seemingly identified defendants as merely the "custodian" of the property, it also granted the UPP administrator the authority to sell the

---

[9] Although plaintiff is critical of the legislative scheme that deposits abandoned property into the general fund where interest is earned, defendants are required to pay interest on property that was interest-bearing, see MCL 567.242 and MCL 567.245(3), and therefore, must act to satisfy this requirement.

-11-

property in a manner designed to acquire the highest value. MCL 567.243(1). And, "[t]he purchaser of property at any sale conducted by the administrator . . . takes the property free of all claims of the owner or previous holder of the property and of all persons claiming through or under the owner or previous holder." MCL 567.243(4). Accordingly, MCL 567.243(1) and (4) allow the UPP administrator to exercise ownership over the presumptively abandoned property by conducting a sale to the highest bidder and to essentially pass unencumbered title to the bidder of the property "free of all claims of the owner or previous holder of the property." MCL 567.243(4). Plaintiff's position that she owns the property, and therefore, has an entitlement to interest earned while in defendants' custody, ignores the presumption of abandonment, principles of dual ownership,[10] and the legislative provisions for defendant to exercise ownership over the property through sale and disbursement to a claimant. Accordingly, we reject plaintiff's characterization of a superior interest of ownership than that held or created in defendants through the UUPA.

## V. PLAINTIFF'S CROSS-APPEAL

Plaintiff first alleges that the COC committed reversible error by failing to conclude that defendants took and spent plaintiff's principal. We disagree.

Because money is fungible, it defeats an action seeking the return of the precise property taken. See *O'Connor v State*, 345 Mich App 595, 611; 9 NW3d 351 (2023);[11] *In re Lewis Estate*, 329 Mich App 85, 104; 941 NW2d 74 (2019).

Additionally, plaintiff asserts that the COC properly denied summary disposition of her interest claims addressing takings and procedural due process. We disagree.

> The [Takings] Clause expressly requires compensation where government takes private property for public use. It does not bar government from interfering with property rights, but rather requires compensation in the event of otherwise proper interference amounting to a taking. Conversely, if a government action is found to be impermissible—for instance because it . . . is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action. [*Rafaeli, LLC v Oakland Co*, 505 Mich 429, 452; 952 NW2d 434 (2020) (citation omitted).]

---

[10] For example, property may be held as tenants in common or joint tenants. See *Merritt v Nickelson*, 80 Mich App 663, 667; 264 NW2d 89 (1978).

[11] In *O'Connor*, the plaintiff failed to make a claim in accordance with the UUPA before filing suit in the COC. Although our Court made statements pertaining to abandoned property, these statements were merely obiter dicta because the dispositive issue was subject-matter jurisdiction. *O'Connor*, 345 Mich App at 610-611. Similarly, we decline to apply *O'Connor v Eubanks* (*O'Connor II*), 83 F4th 1018 (CA 6, 2023), to this case because the Sixth Circuit Court of Appeals ruled on qualified and sovereign immunity. Further, federal decisions do not constitute binding precedent, and we do not determine that decision has persuasive value as applied to this matter. *Secura Ins Co v Stamp*, 341 Mich App 574, 582 n 8; 991 NW2d 244 (2022) (citation omitted).

Takings are comprised of two types, physical and regulatory. *Mount Clemens Recreational Bowl, Inc v Dir of the Dep't of Health and Human Servs*, 344 Mich App 227, 240; 998 NW2d 917 (2022) (citation omitted). The physical taking of private property constitutes a categorical taking for which payment of just compensation is required. *Id*. A regulatory taking involves the deprivation of all economic and beneficial use of property is also categorical and requires payment of just compensation. Further, a noncategorical regulatory taking requires balancing economic impact and interference with reasonable investment-backed expectations. *Id*. Additionally, inverse condemnation occurs when the government takes property through physical invasion or regulation without formal condemnation proceedings. *Id*.

Addressing procedural due process, it minimally requires that "deprivation of life, liberty, or property by adjudication must be preceded by notice and an opportunity to be heard." *Bonner v City of Brighton*, 495 Mich 209, 235; 848 NW2d 380 (2014) (citation omitted). Procedurally, the opportunity to be heard must be given within a meaningful time and in a meaningful manner. *Id*.

In her answer to the dispositive motion, plaintiff alleged that she pleaded two types of takings, addressing interest generated and transferred to the general fund and principal used to address budget shortfalls. However, the two types of taking are physical and regulatory. *Mount Clemens Recreational Bowl, Inc*, 344 Mich App at 240. Plaintiff did not plead the requirements of a taking and inverse condemnation at issue, the type of action at issue, and manner of the deprivation of procedural due process. Under the circumstances, the COC erred by denying defendants' motion for summary disposition of these claims under MCR 2.116(C)(8), particularly where plaintiff only alleged that defendants served as the custodian of assets. And, plaintiff did not conduct an analysis of these principles in light of the facts of this case. See *The Cadle Co v City of Kentwood*, 285 Mich App 240, 258 n 10; 776 NW2d 145 (2009).

Finally, plaintiff contends that summary disposition was premature because the parties had not yet engaged in discovery. But, plaintiff failed to plead the takings, inverse condemnation, and procedural due process by delineating the elements to support those claims. She merely concluded that there was a taking of the principal and interest without addressing whether a physical or regulatory taking occurred, warranting summary disposition under MCR 2.116(C)(8). Moreover, summary disposition is not premature when a question of law is raised for which additional discovery is not required under MCR 2.116(C)(10). And, plaintiff failed to show that further discovery was likely to uncover factual support for her claims. See *Mazzola v Deeplands Dev Co, LLC*, 329 Mich App 216, 230; 942 NW2d 107 (2019) (declining to require additional discovery when the legal contractual issue of restrictive covenants was presented). Although plaintiff sought to discover information regarding defendants' maintenance and contents of the general fund, her complaint did not preliminarily identify the elements of her claims. Under these circumstances, summary disposition was not premature.

Affirmed in part and reversed in part. No costs are awarded because a public question is involved.

/s/ Anica Letica
/s/ Noah P. Hood
/s/ Allie Greenleaf Maldonado